Please call the first case, please. 12.418, Northwoods Nursing Center Mr. Blumel, for the... Thank you, Your Honor. Your Honor, I am requesting an amendment for the five-minute short vote. Fine. Please proceed. Good morning, Your Honors. Nicholas Rumel for the appellant and the plaintiff, Jennifer Latowski. I want to initially start talking about the defense in this case. The defense in the district court below stressed the theory that the policy in this case is facially neutral and therefore it is not discriminatory. But this is not about a policy in the abstract. This is about how the policy was applied or enforced. And here there is sufficient evidence that it was enforced in a selective way against pregnant women almost as a preemptive strike. All the employees here who were pregnant were told that they had to get a doctor's note. All of the non-work injuries, people who were injured off the job, the only way the employer knew about those injuries was when those employees presented requests for accommodations. We know that from Exhibit 12 in the record, which is 28-13. What does that have to do with the question of whether that policy was applied whenever they knew that there was a medical condition? Because we have evidence that they selectively chose to not apply that policy when they learned of non-pregnant medical conditions. And actually, Your Honor, the best comparator... So you have evidence that if they knew that there was a non-work medical condition, they didn't require a doctor's note? Yes. Boy, I missed that in the briefs. What employees are those? It's actually, Your Honor, Jennifer Letowski herself, the applicant, not the pregnant Jennifer Letowski, was the best evidence of that. When she applied, as the Court knows, the employees were required to get a physical. They were told to simply get a physical. They were not told what format it had to be. And then the doctor would fill out a form indicating their medical history questionnaire. Jennifer Letowski's medical history questionnaire is... This is when she said she had a back problem or something? Right. Okay. Do you have anybody else other than her as an example? Other than her who we know, no. But on the other hand, there's nobody else who told the employee that they had an injury... So the only example you have of this unequal application vis-à-vis pregnant women is what happened to your client before she was an employee? I'm not saying that's right or that's good or bad. Factually, is that correct? I think that's correct. But first of all, before she became... Okay. You answered the question. Thank you. Thank you, Your Honor. But I did want to follow up with that to say that I don't think the fact that she was an applicant is significant because we have that comparator, Amanda Jay, who was told to get a note that she had no restrictions when she was pregnant. And that was during the application process as well. And the employer has pointed out that when she presented a note that said she had restrictions, that they stopped the application process and that they did not hire her later. They rehired her. So the fact that it's an application... I thought really the thrust of your argument on that point was that the only condition that would become readily apparent is somebody being pregnant. And therefore, that's why this is a facially discriminatory policy. Did I misunderstand that? No, that's certainly a big part of it, Your Honor. I mean, somebody with a cold... I'm curious why you believe that to be true. Surely there are lots of other conditions, are there not, that will become readily apparent when the employee shows up for work in addition to or other than being pregnant. There may be some conditions that are readily apparent or others that may not be. I agree that there may be others that may not be, but there certainly are others. Pregnancy is not the only thing that will be obvious when somebody shows up. Is that correct? I certainly would agree with the court. So if that's the case, then just reading the wording in the policy, why is it facially discriminatory? We're not talking about how it's applied. Well, as I said at the outset, Your Honor, on its face, if you wrote that policy down, it's not discriminatory. We can short-circuit a lot of this if you agree it's not facially discriminatory and then move on to was it applied in a discriminatory way. So are you conceding it is facially non-discriminatory? Just as many employers have anti-discrimination policies... Can you reduce that to yes or no so we can move on? Oh, thank you. Yes, Your Honor. I'm conceding... That it is facially non-discriminatory. Now we're going to go to application. I would like to say with one caveat, there is some factual dispute about what the policy actually was. The employer says in its brief that the policy was that if anything medical is brought to our attention, we require a doctor's note at your next visit. But Judy Doyle, the nursing manager, testified later, it's not required. You're encouraged, but not required. And if you don't do it, you can do that. And she said that at pages 11 and 64 for deposition. Again, just to make this simple, trying to clear the decks here, we've got two possible versions of what this policy is. Do you agree that at least facially, both of them, whether it's your version or their version, are facially non-discriminatory? I do. Then we can move to the real meat of this, it seems to me, which is application. Yes, I do agree, Your Honor. Okay, fair enough. Thank you. So they applied it in a discriminatory fashion by making what we call that so-called preemptive strike by pregnant women being told, go get that note. And here's why that's a problem. The way they applied it for pregnant women is not letting them wait for their next appointment. As we know, Jennifer Letowski didn't have a doctor's appointment scheduled for two weeks. It forced her to do that very truncated procedure where she had to call her doctor, didn't even speak to her doctor, spoke to somebody on the phone. They faxed a letter to Northwoods with the restrictions, and I'm not sure if in the record you see that it's not even signed by the doctor, it's signed by a medical assistant. So she was deprived of that opportunity to have a face-to-face with her doctor to discuss what the essential functions of her job were. I apologize, but let me interrupt there because I don't get this either. Fair enough. There's a lot of discussion about how she was required to go right away and not wait, I think, two weeks. I will tell you I simply never grasped why that made a difference here one way or the other, assuming that it's true, particularly whereas here they encouraged her to go back to the doctor because she said it was a mistake and get that restriction lifted, which she believed would happen because she knew it was a mistake, but she refused to do so. So I just never understood, I'm not questioning whether it did or didn't happen, I just never understood the relevance of that. Our argument is that to create that rebuttable presumption that the woman is disabled until you can prove otherwise was treating her differently than the employees with non-work injuries. And I do want to point out for the record, too, that it's not true that she... But to say that, you have to point to somebody that they knew had a medical condition and that they allowed them to wait a bit, whatever that is, before they got their doctor's note. Do we have any evidence of that? Do we have a comparable for that? Except for Jennifer Rotowsky when she applied, when you look at Exhibit 12, which is their list of people with all of the non-work injuries, the way that they presented, they have the list, how it was presented to the employer... Simple question. You're arguing, you say, well, that's a problem, they made her go right away. And if you can show unequal treatment between two similarly situated employees, then I get that. But you didn't say that, I don't think. So why do we care if they made the... I'm just trying to figure out what difference does it make if you have to produce the note quickly or you can wait for your next appointment two weeks later, whether you're pregnant or have a broken leg or a back pain or whatever it is. What difference does it make? Two key differences. One is that, as I mentioned a moment ago, it deprives that person of having a true interaction with their doctor to figure out what legitimate restrictions may apply. And the second thing is it's contrary to their policy. If their policy is you can wait until your next appointment, the facts and the record are they did not allow her to do that. The facts and the record are they made her do that right away. And the defense does say she had a chance to go to her doctor and get that corrected. We do point out in our brief, she did try to do that. She was trying to call and get that corrected. But once they walked her out on October 2nd, she stopped doing that. And we consider that the point of discharge. That's the adverse action. In fact, according to Jennifer Letowski, Judy Doyle said, yes, you are discharged in response. So she did stop trying to get it corrected after that point. But she did make some calls. Help me out here one other time too. I'm sorry I'm the only one asking questions. But I just don't also understand why she believed it was a mistake. She was convinced it was a mistake. She thought she could get it corrected. But she just quit trying to get it corrected both before they walked her out and after they walked her out. What? It seems like this was so simple to make this go away, and now it's a federal case in the United States Court of Appeals. There's got to be something going on behind the scenes that I don't understand. From Jennifer Letowski's point of view, they did make that. She felt rushed. And when she called her doctor to try to get that corrected, she was engaging in a series of phone calls. They told her the doctor would call her back. The doctor never did call her back. She did decide when they discharged her on the second. They escorted her off the property. She said, does this mean I'm discharged? And Judy Doyle said, yes, you're discharged. You're self-resigned. Her employment had terminated at that point. We don't believe that she had an obligation to try to correct that. In hindsight, Your Honor, we might not be here if she had continued to try to do that. We do know that afterward, like the October 15th conversation and the December 1st conversation when she met with them to look at a file, we do know that they said you can reapply if you get that note. But at that point, she was, from a legal standpoint, discharged. And she is, with hindsight, she could have fixed it maybe, but she wasn't able to fix it before she was walked out. Thank you. Counsel, not to pile on here, but she bore some responsibility, did she not, in checking to see that the information that was transmitted from the doctor to the employer was, in fact, accurate. After all, it was her relationship with her physician. So in the absence of a HIPAA waiver or something else from the employer, even if she told them, no, that's not right, there shouldn't be that 50-pound restriction, even if they told them that, wasn't it incumbent on her to make sure what was transmitted was accurate? And when she found out that it was not accurate and it was causing a problem with the employer, return phone calls notwithstanding, if she's not on the job or if she realizes there's been this major mistake that's causing heartburn and problems for her with her employer, why not camp out at the doctor's office until you get what you need that you can provide to the employer? Well, it's an excellent point, Your Honor. But there is really some question about whether it truly was a mistake. We have that letter from her doctor, Dr. Trenkle, in the record afterward, who suggested it's not necessarily a mistake. Jennifer Letowski may have thought it was a mistake, but her doctor said a 50-pound lifting restriction is not unusual. It's something that even a non-pregnant person would have difficulty lifting. And for Jennifer Letowski, it's something that I would just put as a preventative measure. So that letter from the doctor suggested it's not a mistake. I'm sorry, so is it your contention then that this was kind of a blanket policy by this physician with regard to all patients, female patients who become pregnant, 50 pound is going to be my standard restriction? Yes, and that was an interesting point because we went through all of the women who had obstetricians, and the people who went to Dr. Trenkle's practice all had weight restrictions imposed by that practice. The women who went to different OBGYNs did not have weight restrictions. And here Dr. Trenkle is saying this was a normal pregnancy, no documentation she was considered high-risk at any time, normal, uneventful pregnancy, and a weight restriction of lifting no more than 50 pounds was, again, suggesting that that's something that she just would impose for a normal, non-eventful pregnancy. So why is it that one doctor says normal, uneventful pregnancy, 50-pound weight restrictions? If you go to a different practice, normal, uneventful pregnancy, no weight restrictions. How can that be the employer's problem? How is that their fault? It's because... You want them to second-guess the doctor and only believe the one that says no restriction and not follow the doctor that has a restriction. How could that possibly be an obligation on an employer? I'm not suggesting it's their fault. I'm suggesting that it's evidence of pretext. If they're truly concerned about her ability... Let me suggest... You have lots better arguments than that one. Because they follow a doctor's pretext. Thank you, Your Honor. I mean, I appreciate the candor. I think that here we're saying it's evidence of pretext because there is some... We believe if it's truly a good-faith work restriction, then there might be some obligation to engage in an interaction on the employer's fault. It's not an ADA case, so there's no obligation to engage in the interactive process. However, there may be some duty to clarify what a person's restriction is. And one of the things we talked about was, for example, they say any restriction. And we gave a couple examples in our brief, some absurd restrictions, but there are some that aren't so absurd. What if, for example, somebody had a restriction, no exposure to solvents in the workplace, certain solvents. And there are no solvents in this workplace. I get the fact that in the final analysis, you claim there was no weight restriction applicable to this job. But that's the heart of this case. You've admitted it's not facially discriminatory. You've got all this stuff about, gee, she was felt rushed, which I don't think is protected under federal law as far as I know. And you concede that the restriction was actually valid on the part of the doctor. So you can't hold the corporation responsible for that. You're kind of down to being able to say, well, yes, but given all that, here there wasn't a legitimate weight limitation on this job, so therefore that's your evidence of pretext. Isn't that what this comes down to? Not just that. But that is a big part of it. For example, we – I got you. I've taken up far too much of your time. Your red light has been on, but you just mentioned that this is not an ADA case. Are you waiving the ADA claim? No, I am not. Regarded as ADA claim under the Spies v. Marine case is still part of it. But as a regarded as, there's no interactive process that's required. And you had wanted to save your remaining time for rebuttal, I believe. Your red light's on, so you wanted to do that that time. Thank you very much. Good morning, Your Honors. Mark Smith on behalf of Appali Northwoods. Your Honors, I'd like to address a couple of things that Mr. Rommel mentioned in his comments before I turn to my own. I don't believe there's any record support for the proposition that this physician uniformly applies a 50-pound weight restriction, because this physician was never deposed during the course of the underlying proceedings. And Mr. Rommel is simply making an argument that he found a couple of people with weight restrictions from this doctor and saying that must always be true. I don't think there's any record support for that. Was there some letter that he was referring to by this doctor that said something to that effect? Well, she says that it's not unusual to put a 50-pound weight restriction, but I don't think that that letter can be read to say that in all cases, all women get a 50-pound weight restriction. And ultimately, I think, is Judge McKeague appropriately focused on what obligation should an employer have to quiz the doctor, is this really a restriction that we need to follow? And in fact, the record is very clear that Ms. Letovsky was given a safety valve, even in that very first conversation. One, you can talk to your doctor to see if she will lift this restriction, and two, you could get a second opinion indicating that you're not subject to a restriction. We just need to have the ability to say that you can work without restriction. And that never happened here. Where was the requirement of a 50-pound lifting ability prior to the circumstances involving this particular plaintiff? Where would you take us to show us? There is nothing in the record that establishes that in any job description, there is a specific 50-pound lifting restriction. And indeed, the Northwoods was a no-lift facility, correct? Well, no. No? No, that's how they characterize it, but no lift means literally no lifting. They meaning Northwoods? They meaning plaintiff. There's nothing that I'm aware of that says that no one ever lifts at Northwoods. Was it in the deposition of the plaintiff? I believe plaintiffs characterize it as no lift, but then she admitted as I examined her that an everyday part of her job was repositioning patients or residents, helping them in and out of bed, clothing them, unclothing them, in and off the toilet, in and out of the shower. Is there any evidence that was presented that there was a 50-pound lifting requirement? There is no evidence that there's any specific written document that says you shall be able to lift 50 pounds. And the trigger here wasn't 50 pounds. The trigger was that there was a restriction. And the policy, there's been no evidence below. If a restriction on you was that you couldn't lift more than 500 pounds, you would not be able to work there. That's true. But here, it didn't involve a subjective... Couldn't every person except for Atlas have a you may not lift more than 500 pound restriction? Yeah, it could eliminate the whole workforce, and so you wouldn't put on that sort of a restriction. But here, the plain fact is, the entity didn't engage in an analysis for any employee, whether it be a work-related injury, a non-work-related injury, as to how it fits in. It was a policy that if you have restrictions, we will not allow you to perform your job. So they didn't get into that analysis, and then starting to shave hairs, you know, is this a 10-pound or a 5-pound or a 200-pound? It was mechanically applied restriction. That is what's at issue here, and there's no evidence that any individual that had a non-work-related injury, shoveling snow in their driveway or whatever else, was treated any differently than Ms. Letowski as a pregnant employee with a restriction. So to be clear then, you say the policy was any restriction, regardless of whether the restriction related to a particular facet of a job. That's how they applied it here, yes. That's what the testimony has been. You can see there is no written policy, so we have to derive whatever the policy is from the various statements that have been made. Yes and no. There's no written policy that talks about that. There is a policy that indicates that they will not accommodate non-work-related restrictions, and Ms. Letowski admitted she knew of that policy. That policy was discussed during the meeting in December. May I ask, how do you need to accommodate restrictions that do not impact a person's actual job? So my hypo, now I do realize that you could have a patient who weighed more than 500 pounds, but likely there are few in the facility of that nature. If the person is a secretary at Northwoods and doesn't do any lifting of patients and has a 500-pound lifting restriction, that person, if they're stupid enough to give that note to you or you notice that the person has some physical impairment that you then say you must give us a note, that person would not be able to be employed, even though the restriction had nothing to do with the job. And obviously you can manipulate my hypo to make that correct. Sure. And your Honor, I think the point is that that rule may be a dumb rule. It just may not be one that most businesses would adopt. But the plain fact is, this is a discrimination case and there's no proof that that rule was applied any differently to a pregnant worker to someone else. That's the proverbial secretary with a 500-pound weight restriction. If it's applied the same way to all of them, then we're here talking about the wrong thing. That's a business judgment on the part of the employer to apply that sort of policy. And there's no evidence that it's ever been applied any differently. So your opponent has not pointed to a single individual? I'm sorry? Your opponent has not pointed to a single individual as a comparator? No, there's no evidence below that it was ever applied differently. Well, he does argue that his comparator is his client in connection with the application that disclosed this back condition and the employer didn't pursue that. Which, if true, does seem to suggest that there wasn't actually the policy as you've just framed it. How do we deal with that? Except, your Honor, that she was not given a restriction as a result of that pre-employment physical. She was going through the physical... But that doesn't prove anything because the policy as you've described it is if you know there is a non-work-related condition, you have to get a doctor's note that then tells the employer whether there is or is not a condition. So his argument is they knew of the non-work-related condition, but they didn't explore it when she was applying, only applied it when she was pregnant. That seems to be the crux of the argument. Well, but, your Honor, the critical difference there is give us a note whether you're restricted or not. Her physician did not impose restrictions. So whether or not she had a pre-existing back condition that may periodically cause her problems, the doctor did not restrict her from her employment. Ask for a doctor's note. His point is that they didn't ask for a doctor's note when they saw on her application she had a back condition. Well, your Honor, it's before she's even hired. I mean, she's getting a physical. She reveals a prior back condition. The doctor approves her employment at Northwoods. I don't think there's any duty to go... What doctor? When did a doctor get involved in connection with a back condition? This was her pre-employment physical. Oh, I see. So whether they sent her to the pre-employment physical because they saw she had a back condition, or whether they sent all employees to a pre-condition... All employees go for... So you say it doesn't really matter because everybody did it and she didn't have a restriction. Right. So you say... This is interesting. So you say they applied the policy with respect to her back condition the same as they applied it to her lifting restriction. If they even knew that she had this back condition... I mean, remember, this is pre-employment stuff and I'm not sure there's any record evidence that any decision maker even knew that she had a pre-existing back condition at the time that she was sent for her pre-employment physical. What does the record show about the communications from the pre-employment physical doctor to the employer, if any? I believe it's just she's fit for work. I don't think there's anything more complicated than that. Can you tell us where in the record we could look to find whatever communication there is? Or is there no communication in the record and we're just speculating as to what possibly happened? I can't honestly say as I'm standing here that I recall the specific mechanism. I know that in the personnel file there is something from the physician. I don't know below what we did with that other than indicate that she had passed a pre-employment physical and in that physical she had been requested to and did lift 50 pounds. I'm not aware of anything in the record that suggests which decision maker received that and what they did with that information. What I believe happened and in the normal course of business would happen is they send her to the pre-employment physical, she is cleared to work and the hiring process is completed. Now whether Northwoods ever knew of this back condition, I don't know and I can't represent it. The question is, had that pre-employment physical contained any restriction, she would not have been employed. Correct. It's a circumstance akin to what happened to employee Amanda J who was in the process of applying for employment, went for the pre-employment physical and it was discovered she was pregnant. Restrictions were put in place and they stopped the hiring process because she had the restrictions. That same employee, as soon as the restrictions were lifted during the course of her pregnancy, came back. I have no restrictions. They completed the employment process. She was employed and worked through her delivery. So that's not the action of an employer that wants to rid itself of pregnant employees or to take action to screen out pregnant employees. It's an action of an employer that is focused on Do we have restrictions that preclude them from performing the job? If I may, is there anything, as I understand it from the record, at the time in question she was 5'3", 133 pounds. At the time of hiring and a finding of adequacy for the job, surely your client had some expectations about what she could and could not do or would be able to do as part of the job. Why is a 50-pound restriction? I understand you're attempting to say we're blind with regard to what the reason is. Why is a 50-pound restriction problematic? Was the expectation by Northwood that she would be able to perform job duties in excess of lifting more than 50 pounds when she was 5'3", 133 pounds? The restriction is only problematic because it triggered the application of this policy. If you get behind that and look at how it impacted the job, it was Northwood's expectation that she would lift 50 pounds or more than that. It wasn't a specifically articulated position in the job description because where do you draw the line? Fair enough. Is there evidence in the record, though, about her performing job duties prior to her being walked off the job that involved her having to lift more than 50 pounds? No one weighed any of the residents and measured the force that she was required to deal with as a resident was leaning against her, as she was moving someone in and out of bed, in and out of the shower. So we don't know that she lifted more than or less than 50 pounds. In the ordinary course, it's the belief of Northwoods that they lift a lot more than 50 pounds, even using all these adaptive aids. It is a tough job. These people have to reposition residents who can't walk on their own, some of them weighing upwards of 400 pounds. I think if a 400-pound person falls against you, even if you're not physically lifting them off the ground, you're bearing and dealing with more than 50 pounds. And importantly, there's no evidence here. Again, this is a discrimination case. There's no evidence here that Northwoods interprets that 50-pound restriction differently for a pregnant person than for anybody else. Well, there were comments that were made that haven't been discussed in this oral argument, but are discussed in the briefing about concern for the unborn child. Sure. And comments about her belly getting in the way. And I'll address each of those. The concerns for the unborn child came from the director of nursing after the restrictions were known, and as they were talking about what you could do next, the director of nursing had been told by Ms. Letowski that she had at least one miscarriage in the past. And Ms. Doyle, as a nurse, expressed concern that perhaps that's why your doctor has imposed this restriction. And I think, as I mentioned in the briefing, that sort of statement of concern after the restrictions are known isn't something that should be held against the facility. The belly in your way, that's a contradicted fact. For the purpose of this proceeding, we have to take it as true. But it was made by someone more than two months after this decision was made. There's no linkage between that person having any knowledge when this policy was applied to this employee. So it could almost be a straight comment in the context. I think because it happened so long after the fact, it just doesn't have any bearing on the analysis here. And I see I'm out of time. Thank you. Thank you. Thank you, Your Honors. I want to address a couple of things. First, to follow up on the question about that Exhibit 3, that is, in fact, if you look at the top, it says it's a Northwoods medical history form. And on the bottom of that first page, it says the applicant is submitting this. And I asked Judy Doyle about that in her deposition at page 36. So that is their form that goes with the application packet. So to be precise, because they don't have it right in front of me, did the form say that she had back trouble? Yes, it said she had back trouble. It said she wore a back brace. In fact, they wouldn't have known, but she had an injury when she was 12. She broke part of her spine. Yeah, but we want to know, what did they know? They knew she wore a back brace. They knew that she had swollen feet and ankles. They knew that she had shoulder x-ray at one point because of shoulder injury. But she discloses this accurately on the form, right? This is all disclosed on the form. She then has a pre-employment physical because everybody has to. Well, I think that's right. Is that right? That's right. And in the face of this knowledge that the doctor has, plus whatever else she told them in the physical, he doesn't impose any restriction. Well, they didn't. Is that correct or incorrect? The doctor did not, with that form, impose restrictions. That is correct. So how can you say what they did or did not do with respect to this pre-employment process is different than what they did in connection with the discovery that she is pregnant? Because Amanda J was pregnant during... We're not talking about Amanda J. We're talking about Lutowski. Or is that Amanda J? That's different. That's a different one, right? Lutowski. You're switching from what you told me before, which was you were relying upon what happened to your client. Right. So I just asked you some follow-up questions about that, and you're starting to answer by referring to somebody else. But the difference, as I understand it, is that you're saying that with respect to the back, the employer knew she had a back problem because the employer knew she wore a back brace. And the employer did not say, Aha, you have something that makes us think maybe your doctor might impose conditions, therefore go get a note from the doctor. Correct. Whereas when it was the pregnancy, the employer finds out she's pregnant, and the employer says go to your doctor and get a note saying you have no conditions. So there is different treatment when there is an employer that has knowledge of a condition that might impact the work involving this particular woman. When it's the back, they let her work merrily, potentially having a 400-pound person lean against her when she's wearing a back brace, and they know she's wearing a back brace. But when she's pregnant, they will not allow anything to happen until the doctor says you have no conditions on your employment. Correct. Is that really your position, given the fact that they knew of the back problem and they had a pre-employment physical that said there's no restriction? Are you saying to be consistent, she shows up at work, she's been cleared to work in the face of the disclosure of the back condition, to be consistent then they had to send her to another physical the day she shows up at work when she just completed one satisfactorily the prior week? Is that your position? Not exactly, Your Honor, and I understand what you're asking now, and I apologize I wasn't quite clear earlier. And the reason I brought up Amanda Jay is because Amanda Jay's text messages is that during the application process, when they learned she was pregnant, they said go get a note. She said as soon as they found out it was prego, they said go get a note. And when they told her that, that's different during the application process than it was for Jennifer Letowski, and it's one piece of evidence. Just so I understand this correctly, you go for a pre-employment physical. Apparently, at least it sounds like, so tell me if I'm wrong, in the Amanda Jay case, rather than relying upon that doctor, the generalist who I assume does these zillions of employment physicals, they said get a note from your doctor that they knew was already treating that specific condition, i.e. your pregnancy. That's somehow discriminatory? It's a difference in treatment, and I believe it is evidence of discrimination. It's certainly not the only evidence here of discrimination. If I may close... So somebody has a heart condition, and they go to a pre-employment physical with presumably a generalist. If they were then to say, and we also want to hear from your heart doctor, because he or she is the one that really has the inside information about your condition, that's somehow discriminatory? Their policy is, quote, anything medical that is brought to our attention, you are required to get a note from your doctor saying you have no restrictions. Well, here's an example where something medical was brought to their attention, and they did not require her to get a note saying no restrictions. And that was the point of that comparing Jennifer Letowski, the applicant, to Jennifer Letowski, the pregnant person. And also to add the point that it didn't matter that it was during the application process because it was Amanda Jay during the application process when her pregnancy was disclosed, and that's when they said they put on notice of the pregnancy at that point and they said go get a note. And that's one piece of evidence. Okay, I got it. Thank you. And your red light is on again, so we have to conclude the argument. Thank you very much, Your Honor. Thank you both for your argument. The case will be submitted, and the clerk will call the next case.